6/16/2023 4:14 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 76713543
By: Rhonda Momon
Filed: 6/16/2023 4:14 PM

2023-37814 / Court: 165

**CAUSE NO. ____________**

| | | |
|---|---|---|
| **BRANDON ROY and CHRISTOPHER GABEL** | )( | **IN THE DISTRICT COURT OF** |
| | )( | |
| ***Plaintiffs*** | )( | |
| | )( | |
| **v.** | )( | **HARRIS COUNTY, T E X A S** |
| | )( | |
| **THE FAY LAW GROUP, P.A., CARAGH FAY and THOMAS FORTUNE FAY** | )( | |
| | )( | |
| | )( | |
| ***Defendants*.** | )( | **________ JUDICIAL DISTRICT** |

**PLAINTIFFS' ORIGINAL PETITION FOR BREACH OF CONTRACT, TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS, AND DECLARATORY JUDGMENT**

Plaintiffs Brandon Roy and Christopher Gabel (collectively, "Plaintiffs"), complains of The Fay Law Group P.A., Caragh Fay, and Thomas Fortune Fay (collectively, "Defendants"), and for cause show as follows:

## I. DISCOVERY

1.1 Plaintiffs allege that discovery should be conducted under Level 3 of Rule 190.4 of the Texas Rules of Civil Procedure.

## II. PARTIES

### A. The Plaintiffs

2.1 Plaintiff Brandon Roy is an individual and attorney residing and practicing law in Harris County, Texas, at all times relevant to this suit.

2.2 Plaintiff Christopher Gabel is an individual and attorney residing and practicing law in Harris County, Texas, at all times relevant to this suit.

### B. The Defendants

2.3 Defendant The Fay Law Group P.A. ("Fay Law Group") is a professional association and law firm with its principal office located in Montgomery County, Maryland. Citation may be served by service on Caragh Fay, its managing partner at 6205 Executive Boulevard, Rockville, Maryland 20852-3906.

2.4 Defendant Caragh Fay is an individual, the managing partner of the Fay Law Group, and a resident of Montgomery County, Maryland. Citation may be served by service at her residence of 4104 Brookeville Rd, Brookeville, Maryland 20833.

2.5 Defendant Thomas Fortune Fay is an individual, the founding partner of the Fay Law Group, and a resident of Guilford County, Maryland. Citation may be served by service at his residence of 11 Cherine Way, Greensboro, North Carolina 27410.

## III. JURISDICTION AND VENUE

3.1 Plaintiffs seek monetary relief of over $1,000,000. In the alternative, Plaintiffs seek non-monetary relief in the form of a declaratory judgment. The relief sought is within the jurisdictional limits of the Court.

3.2 Venue is proper in Harris County, Texas, under § 15.002 Tex. Civ. Prac. & Rem. Code because all or a substantial part of the events or omissions giving rise to the claims arose in Harris County, Texas.

## IV. PLAINTIFFS' ATTORNEY-CLIENT AGREEMENTS WITH CLIENTS AND JOINT VENTURE AGREEMENT WITH DEFENDANTS

### A. Background on the Beirut Bombing Litigation

4.1 Plaintiffs and Defendants represent over 200 U.S. armed service members and their families ("Clients") in litigation against the Islamic Republic of Iran ("Iran") arising from the October 23, 1983 bombing of the U.S. Marines barracks in Beirut, Lebanon (the "Beirut Bombing"). Clients first retained ***only*** Plaintiffs, not Defendants, as their lawyers to pursue this litigation. Plaintiffs later agreed to a joint venture with Defendants to pursue these matters for all lawyers' clients, and many Clients signed a second retainer agreement that added Defendants as their lawyers. At no point did Plaintiffs stop representing Clients. Then, in September 2022, ***Defendants sought to cut Plaintiffs out of the very representations Plaintiffs had brought Defendants into by purporting to "fire" Plaintiffs from their own Clients***. At the same time, ***Defendants wrote to Clients, falsely stating that Plaintiffs no longer represented them***. This action follows.

4.2 The Beirut Bombing was the single deadliest day for the U.S. military since the Tet Offensive of the Vietnam War in 1968. Two-hundred-forty-one U.S. service members were killed in the suicide attack, and many others were seriously injured. The terrorist group behind the attack, Hezbollah, was backed by the Iranian government.

4.3 Generally, other nations enjoy jurisdictional immunity in U.S. courts under the Foreign Sovereign Immunities Act ("FSIA"). Congress, however, has created a statutory exception to this rule that allows victims of state-sponsored terrorism like the Beirut Bombing—both those injured or killed and their family members—to sue the governments responsible. *See* 28 U.S.C. § 1605A.

4.4 In the 2000s, Maryland lawyer Defendant Thomas Fortune Fay developed a niche practice litigating claims arising from the Beirut Bombing, filing numerous such cases. In each, Iran defaulted, leaving the only matter for determination the award of damages to the plaintiffs. This involved appointment of a special master, with each plaintiff submitting proof of damages (usually through a combination of documentary evidence and a brief deposition taken by the plaintiff's own attorney). On his website, Fay touts his work as a "pioneer" in the area and success "obtaining judgments exceeding $900 million against foreign state sponsors of terrorism."[1] More recently, his daughter, Defendant Caragh Fay, has taken over his practice. But despite the firm's experience in the area, Defendants were unable to convince a substantial number of Beirut Bombing victims to hire them.

**B. Plaintiffs' Existing Contracts to Represent Victims of the Beirut Bombing**

4.5 Through relationships in the military community, Plaintiffs were asked by many victims of the Beirut Bombing to represent them in claims against Iran. Plaintiffs agreed to investigate these claims. Plaintiffs, from their offices in Harris County, Texas, spent ***thousands of hours of legal work*** meeting and speaking with potential clients, vetting each claim, and gathering the documentary evidence necessary to prosecute those claims (which included evidence such as proof of military status, the service members' presence in Beirut nearly three decades earlier, and the injuries suffers). Eventually, the number of Clients Plaintiffs represented grew to over 200. ***Defendants were not involved in, and contributed nothing to, this exhaustive vetting and evidence-gathering process, nor did they have any involvement in retaining these Clients***.

4.6 In and around 2017, Clients signed contingent fee agreements ***only with Plaintiffs***, not Defendants, with a clause setting venue for any disputes in Harris County, Texas, to reflect Plaintiffs' performance on the contracts primarily from their Houston offices (the "Roy/Gabel Fee Agreement"):

> This Agreement and any dispute between you and the Firm shall be construed under and in accordance with the laws of the State of Texas, and all obligations of the parties created hereunder are performable in Harris County, Texas. The venue for any dispute between you and the Firm shall be . . . in Harris County, Texas and you consent to such venue.

**C. Plaintiffs' Joint Venture Agreement with Defendants**

4.7 After amassing this large number of Clients and a wealth of evidence to support their claims—***without any contribution by or involvement of Defendants***—Plaintiffs sought to joint venture with a firm experienced in the esoteric area of this FSIA exception that could also help share the costs of litigating these cases on contingency. Based on Defendants' representations of their past successes in this area, Plaintiffs approached Defendants and proposed a joint venture to represent Plaintiffs' Clients and a limited number of Defendants' clients. Defendants eagerly

[1] *See* https://www.faylawpa.com/terrorism-claims/.

agreed to Plaintiffs' proposal, as the joint venture with Plaintiffs allowed Defendants to gain access to a large number of claims that they had been unsuccessful in signing up on their own.

       4.8       Plaintiffs and Defendants thus signed an agreement in 2017 to joint venture Clients' cases, which would be filed in a single action in federal court in Washington, D.C., under the name of lead plaintiff Terry Hudson's estate and Hudson's family. *The Hudson family's claims, like the vast majority of the other claims to be filed in this new action, were vetted and retained by Plaintiffs well before Defendants were ever asked to get involved.*

       4.9       The single-page Joint Venture Agreement between Plaintiffs and Defendants stated ***in its entirety***:

> The Fay Law Group and Brandon Roy and Christopher Gabel ***agree to share (50-50[1])*** the Hudson v. Iran case, which will be filed before the US District Court for the District of Columbia in 2017.
>
> Under the terms, each of the firms understand that there are Lobbyist Fees and Investigator Fees that will be charged against the clients, ***at distribution of any funds.*** Each of the firms also understand that if collection is made on behalf of the Plaintiffs from the U.S. Victims of State Sponsors of Terrorism Compensation Fund (USCSST) or any other compensation fund created by Congress and enforced by the Department of Justice that the attorney fees will be reduced based on the federal law.
>
> [1]Brandon Roy and Christopher Gabel receiving 50% of the total attorney fees and Fay Law Group receiving 50%.

Plaintiffs Roy and Gabel and Defendants Caragh Fay and Thomas Fortune Fay signed the Joint Venture Agreement. The Joint Venture Agreement contained ***no provision whatsoever regarding the allocation of labor or expenses*** between Plaintiffs and Defendants, nor ***any*** ground on which one more attorney may take over Clients' representation to the exclusion of any other attorney.

       4.10     To execute the Joint Venture Agreement, many (but not all) of Plaintiffs' Clients signed new contingent fee agreements with Plaintiffs and Defendants. (Defendants had associated with another lawyer named Steven R. Perles and were now operating as "Fay & Perles, FSIA Litigation Partners.") Perles is not a party to this lawsuit. The attorney-signatories to these new agreements (the "Roy/Gabel/Fay/Perles Agreements") were Plaintiffs, Defendant Caragh Fay, and non-party Perles. Critically, ***nothing*** in the Roy/Gabel/Fay/Perles Agreements provided any mechanism by which, or condition on which, any of the attorney-signatories could terminate the agreement against another ***attorney*** who was party to the agreement. Further, the new agreements contained no choice-of-law or forum-selection clauses, and they did not refer to or supersede the preexisting Gabel/Roy Fee Agreements that Plaintiffs had executed with Clients before bringing Defendants into these cases.

4.11 With Plaintiffs providing the benefits of their relationships with Clients, the many hours spent vetting Clients' claims, and evidence supporting Clients' claims to the joint venture, Defendants focused on handling the day-to-day litigation of these claims. Defendants filed suit in U.S. District Court for the District of Columbia, where prior iterations of the litigation against Iran for its sponsorship of the Beirut Bombing had been heard. As the Joint Venture Agreement directed, Clients' cases proceeded as a collective action captioned *Estate of Terry Hudson et al. v. Islamic Republic of Iran* (the "*Hudson* Matter"). Case No. 1:19-cv-377, D.D.C. (filed Feb. 13, 2019). Defendants insisted that they alone, and not Plaintiffs, be listed as attorneys of record on the pleadings. Although Defendants took the lead in the litigation (as the parties had intended), Plaintiffs remained involved, maintaining contact with Clients for several years, taking several-dozen depositions, and hiring another attorney—at Plaintiffs' expense—to assist them in taking additional depositions.

**D. Defendants Breach the Joint Venture Agreement in a Ploy to "Fire" Plaintiffs from Their Own Clients and Take Exclusive Control of the *Hudson* Matter**

4.12 On September 15, 2022—with the *Hudson* Matter still in litigation—Defendants sent Plaintiffs a letter purporting to ***fire*** Plaintiffs from representing the very Clients whom Plaintiffs had brought Defendants in to jointly represent (the "Fay Termination Letter"). The letter declared that Defendants were unilaterally "***canceling*** our joint counsel agreement due to your inability to perform," providing several spurious justifications for their remarkable gambit to ***cut Plaintiffs out of their own cases***.

4.13 Defendants complained that Plaintiffs had not performed 50% of "the work" on the case, which Defendants claimed entitled the Fay Group to not only to terminate the joint venture, but ***all*** of the attorney fees from the cases Plaintiffs had brought them. Even as they pursued this ploy, Defendants acknowledged Plaintiffs' central role as the reason for Defendants' involvement in the first place. The letter stated that "[w]e signed a joint counsel agreement ***on the cases you provided*** in the Hudson matter where we split half the work, half the fees and half the costs." It further claimed that "[w]e agreed to split the fee 50-50, split the duties involved, and the money needed to get a satisfactory judgment for the Hudson clients ***that you brought to my law firm***." The letter complained that Plaintiffs had taken an insufficient number of depositions in Defendants' view and that another lawyer Plaintiffs had hired to help with depositions—at Plaintiffs' expense—had not yet been paid.

4.14 The Fay Termination Letter ignored that, in truth, the Joint Venture Agreement said ***nothing*** about the division of labor or costs of litigation. Defendants offered ***no support***—from the Joint Venture Agreement or any other source—that the parties had ***ever*** agreed to evenly allocate the day-to-day litigation work or to split upfront expenses as incurred ***during*** the litigation. To the contrary, the Joint Venture Agreement had expressly provided that expenses would be charged "***at the distribution of funds***," while Plaintiffs had only sought Defendants' involvement in Plaintiffs' cases to begin with precisely because of Defendants' claimed ability to handle the day-to-day litigation tasks effectively and cover litigation costs until funds were distributed at disposition.

4.15 The Fay Termination Letter further omitted that Defendants ***never once*** invoiced Plaintiffs for expenses before Defendants "cancelled" the Joint Venture Agreement—purportedly on the ground that Plaintiffs had not adequately contributed to those expenses. Meanwhile, the letter entirely overlooked the ***thousands of hours*** Plaintiffs had spent speaking with Clients, evaluating their claims, and gathering documentary evidence to support those claims before the *Hudson* Matter was filed—legal work to which Defendants never contributed. It also ignored that Plaintiffs had in fact taken several-dozen depositions and hired another lawyer to handle more. Defendants' complaint that that lawyer had not yet been paid failed to acknowledge that the agreement for that attorney's services was between Plaintiffs and that lawyer, not Defendants, and the assisting attorney had agreed to work on contingency, with payment due ***only on successful recovery***.

4.16 Defendants were thus wrong in their stated reasons for unilaterally "cancelling" the Joint Venture Agreement in two fundamental respects: (1) the Joint Venture Agreement did not provide, and the parties never intended, that litigation costs and duties be evenly divided between Plaintiffs and Defendants, and (2) Plaintiffs substantially contributed to the joint venture not only by bringing Clients' cases to the enterprise to begin with, but by expending thousands of hours of legal work both before and during litigation of the *Hudson* matter.

4.17 The Fay Termination Letter also claimed that "under DC Ethics Rules [of Professional Conduct] 1.5(e), lawyers can divide fees when the division is in proportion to the service performed by each lawyer"—wrongly implying that attorneys must perform equal litigation duties when dividing fees, lest ***all*** of the lesser-involved lawyer's fees be ***forfeited***. Yet the Comments to the same rule that Defendants cited make clear that the referring lawyer is ***not*** required to perform any specific portion of the legal services:

> The concept of joint responsibility does ***not*** ***require the referring lawyer to perform any minimum portion of the total legal services rendered.*** The referring lawyer may agree that the lawyer to whom the referral is made will perform substantially all of the services to be rendered in connection with the representation, without review by the referring lawyer. Thus, the referring lawyer is not required to review pleadings or other documents, attend hearings or depositions, or otherwise participate in a significant and continuing manner.

Comment 12, Rule 1.5(e), D.C. Rules of Prof. Conduct (emphasis added). Nothing in the rule supported Defendants' position that they may unilaterally cancel the Joint Venture Agreement and take over representation of Clients' claims.

4.18 Separately, the Fay Termination Letter advanced several spurious, unsupported, and plainly unprofessional *ad hominem* attacks against Plaintiffs. The allegations had no relevance to Plaintiffs' obligations under the agreement, and Defendants made no effort to explain why they provide them a basis to "cancel" that agreement or interfere with Plaintiffs' preexisting contractual relations with Plaintiffs own Clients. Beyond being baseless and irrelevant, Defendants' *ad hominem* attacks ignored ***substantiated*** allegations of misconduct and lack of diligence against Defendants in the public record. Thomas Fay Fortune has been admonished by the D.C. Bar and federal court of appeals for "multiple violations" of the D.C. Rules of Professional Conduct. *See*

*In re Thomas Fortune Fay, Respondent*, Case No. 14-BG-7 (D.C. Cir. (March 19, 2015). Separately, the Fay Law Group was ordered to show cause ***in this litigation*** for failing to timely prosecute Clients' claims after insisting that Defendants alone (and not Plaintiffs) be named counsel of record. *See Hudson* Matter, ECF No. 41. Even so, Plaintiffs never sought to use Defendants' failings as pretexts for terminating the Joint Venture Agreement.

**E. Defendants Interfere with Plaintiffs' Attorney-Client Agreements by Falsely Claiming that Plaintiffs Had Failed to Represent Clients or Prosecute Clients' Claims**

4.19 ***Nowhere*** did the Fay Termination Letter assert that any ***Client*** was dissatisfied with Plaintiffs' representation or wished to terminate their preexisting attorney-client relationships with Plaintiffs. Yet Defendants purported to do terminate those relationships ***on Clients' behalf*** while smearing Plaintiffs with false accusations—all behind Plaintiffs' backs.

4.20 Enclosed with the Fay Termination Letter was a copy of a September 13, 2022 letter Defendants had already sent to ***all*** Clients in the Hudson *Matter* (the "Fay Client Interference Letter"). The letter was a bald attempt to mislead Clients into breaching their existing contractual relations with Plaintiffs so that Defendants could take complete practical and economic control of Clients' claims.

4.21 The Fay Client Interference Letter began with a page-long "update" on the *Hudson* Matter litigation and provided instructions to Clients on what they should do to continue pursuing their claims, instructing Clients to call the Fay Law Group's office to accomplish various tasks. The letter left no doubt that Defendants were Clients' lawyers and would continue to be throughout the litigation. It also expressly stated that Clients should "not share any information from this letter."

4.22 Then, on its second page, the Fay Client Interference Letter informed Clients that Plaintiffs were no longer involved in the litigation and encouraged Clients to sign a new contingent fee agreement ***only*** with Defendants. The letter stated:

> Some of you [Clients] signed a retainer with both the Fay Law Group and Roy & Gabel Law Firm. ***The Roy & Gabel law firm no longer exists.*** Brandon Roy and Chris Gabel were to participate in this case, but they have not. As a result, ***the Fay Law Group has continued to prosecute your claims in the absence of Roy & Gabel and despite their lack of representation***, we have paid all the expenses involved in prosecuting your case. . . . . ***[D]ue to Roy & Gabel's failure to prosecute and represent your claims, we are cancelling our joint agreement with Roy & Gabel and sending you a new retainer for the Fay Group alone***. You do not have to sign the retainer but ***you need new representation should you choose to not sign the retainer***. If you choose to sign a new retainer with Roy & Gabel, then we suggest you contact them.

4.23 Thus, while purporting to give Clients a choice, the Fay Client Interference Letter created the misimpression that Defendants had been and were continuing to aggressively prosecute

Clients' claims, while Plaintiffs had not. It also wrongly suggested that Clients no longer had a contractual relationship with Plaintiffs.

4.24 The Fay Client Interference Letter contains numerous material misstatements and omissions that, individually and together, wrongly and intentionally interfered with Plaintiffs' existing contractual relations with Clients:

4.24(a) *First*, it falsely conveyed that Defendants had the authority to unilaterally terminate Plaintiffs' contractual relations with Clients for them. Defendants had none. Yet Defendants claimed to do so anyway in a naked bid to steal Plaintiffs' Clients and usurp the 50% share of attorney fees owed Plaintiffs in the *Hudson* Matter under the terms of the Joint Venture Agreement.

4.24(b) *Second*, it misrepresented Plaintiffs' roles in the litigation and the nature of their Joint Venture Agreement with Defendants. Plaintiffs joint ventured with Defendants with the intent that Defendants would take the lead in the litigation phase of Clients' cases, Plaintiffs having carried the load in the claim investigation and pre-litigation phases. Such an arrangement was perfectly proper, consistent with the parties' agreement, and directly in line with the D.C. ethics rule that Defendants erroneously cited in the Fay Termination Letter.

4.24(c) *Third*, it falsely stated that Plaintiffs had not participated in the prosecution of Clients' claims. In fact, ***Plaintiffs had spent thousands of legal hours*** during the pre-litigation phases vetting, investigating, and gathering the necessary evidence for Clients' claims before Defendants were ever involved. Even after suit was filed, Plaintiffs remained involved, maintaining contact with Clients, taking a number of depositions, and engaging another attorney (at Plaintiffs' sole expense) to take additional depositions. Plaintiffs thus did not "fail[] to prosecute" or "represent [Clients'] claims" in any way.

4.24(d) *Fourth*, it omitted that, in the same moment that Defendants were maligning Plaintiffs for not adequately prosecuting Clients' claims, ***Defendants were falling so far short in their representation of Clients in that matter that Clients' claims risked being dismissed***. In an April 11, 2023 order, U.S. District Judge Royce Lamberth recounted how, despite being ordered on December 9, 2021, to submit a status report on the progress of their damages proof every 30 days, Defendants had failed to do so on: January 10, 2022; February 9, 2022; March 11, 2022; April 11, 2022; May 11, 2022; June 10, 2022; July 11, 2022; August 10, 2022; September 9, 2022; October 11, 2022; November 10, 2022; December 12, 2022; January 11, 2023; February 10, 2023; March 8, 2023; or April 7, 2023. That is, at the time Defendants sent Clients the Fay Client Interference Letter, Defendants had failed to submit court-ordered status reports ***for nine months***. Defendants continued in their dereliction for seven more months—more than a year and a half in total—until ***the court ordered Defendants to "show cause why [Clients' claims] should not be dismissed for want of prosecution and for failure to comply with [the court's] orders."*** *Hudson* Matter, ECF No. 41.

4.24(e) *Fifth*, it implied that because Plaintiffs were no longer operating as a single law firm, their relationships with Clients had changed such that they could no longer participate

as Clients' lawyers. The claim was unsound on multiple levels. For one, Plaintiffs had expressly signed Roy/Gabel/Fay/Perles Fee Agreements as representatives of their own law firms, not "the Roy & Gabel law firm." (Ironically, Defendants signed those agreements as "Fay & Perles," which appears to have since dissolved.) Regardless, even had the nature of Plaintiffs' association with each other changed, Defendants had no basis to imply that Plaintiffs' contracts with Clients were terminated as a result.

4.24(f) *Finally*, it concealed Defendants' knowledge that ***Plaintiffs had preexisting attorney-client relationships with Clients*** that governed Clients' claims. As detailed above, Plaintiffs and Clients signed the Roy/Gabel Agreements in 2017, ***before Defendants ever got involved***. These agreements related to Clients' claims arising from the Beirut Bombing and were neither addressed nor expressly superseded by the Roy/Gabel/Fay/Perles Agreements. Yet in the Fay Client Interference Letter, Defendants said ***only*** that "[s]ome of you signed a retainer with both the Fay Law Group and Roy & Gabel Law Firm [*i.e.*, the Roy/Gabel/Fay/Perles Agreements]," omitting that—as Defendants knew—Clients had entirely separate fee agreements with Plaintiffs covering the same claims. Nevertheless, the Fay Client Interference Letter created the misimpression that Clients had no continuing relationship with Plaintiffs regarding these claims and that they should sign "a new retainer for the Fay Law Group ***alone*** . . . so that Fay Law Group can continue to prosecute your claims."

4.25 The Fay Client Interference Letter constituted an intentional effort to mislead Clients into breaching their contracts with Plaintiffs in order for Defendants to usurp the attorney fees to which Plaintiffs are entitled in the *Hudson* Matter.

## V. CAUSES OF ACTION

### A. Breach of Contract

5.1 Plaintiffs expressly incorporate and reallege all paragraphs above as if set forth fully herein.

5.2 Defendants breached the Joint Venture Agreement by terminating it without just cause and by repudiating their agreement to pay Brandon Roy and Christopher Gabel 50% of the total attorney fees recovered in the *Hudson* Matter.

### B. Tortious Interference with Existing Contracts

5.3 Plaintiffs expressly incorporate and reallege all paragraphs above as if set forth fully herein.

5.4 Plaintiffs signed contingent agreements (the Roy/Gabel Agreements) with Clients governing Clients' claims arising from the Beirut Bombing before Defendants ever became involved. These contacts, which contained Texas choice-of-law and forum-selection clauses and a venue-selection clause Harris County, Texas, created attorney-client relationships between Plaintiffs and Clients and corresponding contractual obligations and benefits. These agreements were not repudiated or replaced by the Roy/Gabel/Fay/Perles Agreements that followed.

5.5     The Roy/Gabel/Fay/Perles Agreements also created contractual relationships between Plaintiffs and Clients and corresponding contractual obligations and benefits.

5.6     Defendants knowingly and intentionally interfered with Plaintiffs' existing contractual relations with Clients arising from both the Roy/Gabel Agreements and the Roy/Gabel/Fay/Perles Agreements by purporting to unilaterally cancel those attorney-client contracts and soliciting Clients to sign new contingent agreements with Defendants that would cover the same claims. Defendants' interference has made performance of the contracts either impossible or more burdensome, difficult, and expensive. Plaintiffs are entitled to recover damages for mental anguish, injury to their reputations, and loss of profits proximately caused by Defendants' interference.

## VI. CONDITIONS PRECEDENT

6.1     All conditions precedent have been performed or have occurred.

## VII. DAMAGES

7.1     Plaintiffs expressly incorporate and reallege all paragraphs above as if set forth fully herein.

7.2     As a result of Defendants breach of the Joint Venture Agreement and interference with Plaintiffs' existing contracts with Clients, Plaintiffs have sustained financial harm and have lost the benefits expected to be received from the Joint Venture Agreement and contracts with Clients, including the benefit of their agreement for Defendants to pay Brandon Roy and Christopher Gabel 50% of the total attorney fees recovered in the *Hudson* Matter. The measure of damages in an action for breach of contract by repudiation is the total of all accrued payments plus interest, plus the present value of all unaccrued payments that the plaintiff would have received if the contract had been performed. *Republic Bankers Life Ins. Co. v. Jaeger*, 551 S.W.2d 30, 31 (Tex. 1976). Accordingly, Plaintiffs are entitled to recover 50% of the total attorney fees that Defendants recover in the *Hudson* Matter.

## VIII. EXEMPLARY DAMAGES

8.1     Plaintiffs expressly incorporate and reallege all paragraphs above as if fully set forth herein.

8.2     Because Defendants knowingly and intentionally interfered with Plaintiffs' existing contractual relations, Plaintiffs are entitled to and seek to recover exemplary damages.

## IX. REQUEST FOR DECLARATORY JUDGMENT

9.1     Plaintiffs expressly incorporate and reallege paragraphs 1.1 through 4.25 above as if set forth fully herein.

9.2.    In the alternative, Plaintiffs petition the Court pursuant to the Declaratory Judgments Act, Chapter 37 of the Civil Practice and Remedies Code of Texas. Specifically,

Plaintiffs request that the Court declare that: (1) the Joint Venture Agreement is valid and enforceable, and is still in effect, and (2) Defendants' attempts to "cancel" the Joint Venture Agreement and Plaintiffs' contracts with Clients are void and ineffective.

## X. ATTORNEY'S FEES

10.1    Plaintiffs have retained the firm of Sorrels Law to represent the plaintiff in this action. An award of reasonable and necessary attorney's fees to the plaintiff would be equitable and just and therefore authorized by Sections 37.009 and 38.001 of the Texas Civil Practice and Remedies Code.

WHEREFORE, the Plaintiffs requests that the Defendants be cited to appear and answer herein, and that on final hearing, the Plaintiffs have judgment as follows:

1. Judgment against Defendants for Plaintiffs' damages within the jurisdictional limits of the Court.

2. Exemplary damages.

3. Prejudgment interest as provided by law.

4. Postjudgment interest as provided by law.

5. Alternatively, a declaration that (1) the Joint Venture Agreement valid and enforceable and (2) Defendants' attempts to "cancel" the Joint Venture Agreement and Plaintiffs' contracts with Clients are void and ineffective.

6. Attorney's fees.

7. Costs of suit.

8. Such other and further relief to which Plaintiffs may be justly entitled.

[*Signature Block on Next Page*]

Respectfully submitted,

**SORRELS LAW**
*/s/ Randall O. Sorrels*
Randall O. Sorrels
State Bar No.10000000
Eric K. Gerard
State Bar No: 24090121
5300 Memorial Drive, Suite 270
Houston, Texas 77007
T: (713) 469-1100
F: (713) 238-9500
randy@sorrelslaw.com
eric@sorrelslaw.com
**eservice@sorrelslaw.com**

**ATTORNEYS FOR PLAINTIFFS**



Marilyn Burgess
HARRIS COUNTY DISTRICT CLERK
201 Caroline | P.O. Box 4651 | Houston, Texas 77210-4651 | 832-927-5800 | www.hcdistrictclerk.com

## Request for Issuance of Service

**CASE NUMBER:** ______________________________ **CURRENT COURT:** ________________________________________

**Name(s) of Documents to be served:** Plaintiff's Original Petition

**FILE DATE:** 6/16/23__ Month/Day/Year

**SERVICE TO BE ISSUED ON (Please List Exactly As The Name Appears In The Pleading To Be Served):**

**Issue Service to**: Caragh Fay

Address of Service: 4104 Brookeville Rd.,

City, State & Zip: Brookeville, Maryland 20833

Agent (if applicable)

**TYPE OF SERVICE/PROCESS TO BE ISSUED**: (Check the proper Box)

☒ **Citation** ☐ **Citation by Posting** ☐ **Citation by Publication** ☐ **Citations Rule 106 Service**

☐ **Citation Scire Facias** **Newspaper**______________

☐ **Temporary Restraining Order** ☐ **Precept** ☐ **Notice**

☐ **Protective Order**

☐ **Secretary of State Citation ($12.00)** ☐ **Capias** (not by E-Issuance) ☐ **Attachment** (not by E-Issuance)

☐ **Certiorari** ☐ **Highway Commission ($12.00)**

☐ **Commissioner of Insurance ($12.00)** ☐ **Hague Convention ($16.00)** ☐ **Garnishment**

☐ **Habeas Corpus** (not by E-Issuance) ☐ **Injunction** ☐ **Sequestration**

☐ **Subpoena**

☐ **Other (Please Describe)** ____________________________________

**(See additional Forms for Post Judgment Service)**

**SERVICE BY** ***(check one)***:

☐ **ATTORNEY PICK-UP (phone)** __________________

☐ **MAIL to attorney at:** ___________________

☐ **CONSTABLE**

☐ **CERTIFIED MAIL by District Clerk**

☒ **E-Issuance by District Clerk**
**(No Service Copy Fees Charged)**
*Note*: The email registered with EfileTexas.gov must be used to retrieve the E-Issuance Service Documents. Visit www.hcdistrictclerk.com for more instructions.

☐ **CIVIL PROCESS SERVER -** Authorized Person to Pick-up: ________________ Phone: __________

☐ **OTHER**, *explain* ________________________________________________________________

**Issuance of Service Requested By:** Attorney/Party Name: Eric K. Gerard Bar # or ID 24090121

Mailing Address: 5300 Memorial, Dr., Suite 270, Houston, Texas 77007 Phone Number: __713-496-1100

2023-37814 / Court: 165

6/16/2023 4:14:40 PM
Marilyn Burgess - District Clerk
Harris County
Envelope No: 76713543
By: MOMON, RHONDA M
Filed: 6/16/2023 4:14:40 PM

**Request for Issuance of Service**

**CASE NUMBER:** ______________________ **CURRENT COURT:** ______________________________

**Name(s) of Documents to be served:** Plaintiff's Original Petition

**FILE DATE:** 6/16/23__ Month/Day/Year

**SERVICE TO BE ISSUED ON (Please List Exactly As The Name Appears In The Pleading To Be Served):**

**Issue Service to**: Thomas Fortune Fay
Address of Service: 11 Cherine Way

City, State & Zip: Greensboro, North Carolina 27410

Agent (if applicable)

**TYPE OF SERVICE/PROCESS TO BE ISSUED**: (Check the proper Box)

☒ **Citation** ☐ **Citation by Posting** ☐ **Citation by Publication** ☐ **Citations Rule 106 Service**

☐ **Citation Scire Facias** **Newspaper**______________

☐ **Temporary Restraining Order** ☐ **Precept** ☐ **Notice**

☐ **Protective Order**

☐ **Secretary of State Citation ($12.00)** ☐ **Capias** (not by E-Issuance) ☐ **Attachment** (not by E-Issuance)

☐ **Certiorari** ☐ **Highway Commission ($12.00)**

☐ **Commissioner of Insurance ($12.00)** ☐ **Hague Convention ($16.00)** ☐ **Garnishment**

☐ **Habeas Corpus** (not by E-Issuance) ☐ **Injunction** ☐ **Sequestration**

☐ **Subpoena**

☐ **Other (Please Describe)** ________________________________

**(See additional Forms for Post Judgment Service)**

**SERVICE BY *(check one)*:**

☐ **ATTORNEY PICK-UP (phone)** ________________

☐ **MAIL to attorney at:** ________________

☐ **CONSTABLE**

☐ **CERTIFIED MAIL by District Clerk**

☒ **E-Issuance by District Clerk**
**(No Service Copy Fees Charged)**

*Note*: The email registered with EfileTexas.gov must be used to retrieve the E-Issuance Service Documents. Visit www.hcdistrictclerk.com for more instructions.

☐ **CIVIL PROCESS SERVER -** Authorized Person to Pick-up: ______________ Phone: __________

☐ **OTHER**, *explain* ________________________________________________

**Issuance of Service Requested By:** Attorney/Party Name: Eric K. Gerard Bar # or ID 24090121

Mailing Address: 5300 Memorial, Dr., Suite 270, Houston, Texas 77007 Phone Number: __713-496-1100

2023-37814 / Court: 165

6/16/2023 4:14:40 PM
Marilyn Burgess - District Clerk
Harris County
Envelope No: 76713543
By: MOMON, RHONDA M
Filed: 6/16/2023 4:14:40 PM

Marilyn Burgess
HARRIS COUNTY DISTRICT CLERK
201 Caroline | P.O. Box 4651 | Houston, Texas 77210-4651 | 832-927-5800 | www.hcdistrictclerk.com

## Request for Issuance of Service

**CASE NUMBER:** ____________________________ **CURRENT COURT:** ________________________________________

**Name(s) of Documents to be served:** Plaintiff's Original Petition

**FILE DATE:** 6/16/23__ Month/Day/Year

**SERVICE TO BE ISSUED ON (Please List Exactly As The Name Appears In The Pleading To Be Served):**

**Issue Service to**: The Fay Law Group P.A.
Address of Service: 6205 Executive Blvd.,

City, State & Zip: Rockville, Maryland 20852-3906

Agent (if applicable) Caragh Fay by and through the Secretary of State of Texas, PO Box 12079, Austin, TX 78711

**TYPE OF SERVICE/PROCESS TO BE ISSUED**: (Check the proper Box)

☒ **Citation** ☐ **Citation by Posting** ☐ **Citation by Publication** ☐ **Citations Rule 106 Service**

☐ **Citation Scire Facias** **Newspaper**______________

☐ **Temporary Restraining Order** ☐ **Precept** ☐ **Notice**

☐ **Protective Order**

☐ **Secretary of State Citation ($12.00)** ☐ **Capias** (not by E-Issuance) ☐ **Attachment** (not by E-Issuance)

☐ **Certiorari** ☐ **Highway Commission ($12.00)**

☐ **Commissioner of Insurance ($12.00)** ☐ **Hague Convention ($16.00)** ☐ **Garnishment**

☐ **Habeas Corpus** (not by E-Issuance) ☐ **Injunction** ☐ **Sequestration**

☐ **Subpoena**

☐ **Other (Please Describe)** ____________________________________

**(See additional Forms for Post Judgment Service)**

**SERVICE BY *(check one)*:**

☐ **ATTORNEY PICK-UP (phone)** __________________

☐ **MAIL to attorney at:** ___________________

☐ **CONSTABLE**

☐ **CERTIFIED MAIL by District Clerk**

☒ **E-Issuance by District Clerk**
**(No Service Copy Fees Charged)**
*Note*: The email registered with EfileTexas.gov must be used to retrieve the E-Issuance Service Documents. Visit www.hcdistrictclerk.com for more instructions.

☐ **CIVIL PROCESS SERVER -** Authorized Person to Pick-up: ________________ Phone: __________

☐ **OTHER**, *explain* ________________________________________________________________

**Issuance of Service Requested By:** Attorney/Party Name: Eric K. Gerard Bar # or ID 24090121

Mailing Address: 5300 Memorial, Dr., Suite 270, Houston, Texas 77007 Phone Number: __713-496-1100