United States District Court
Southern District of Texas

**ENTERED**

February 21, 2024

Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ROY & GABEL PLLC,                §
BRANDON ROY, and                 §
CHRISTOPHER GABEL,               §
                                 §
        Plaintiffs,              §
                                 §
v.                               §        Civil Action No. H-23-3139
                                 §
THE FAY LAW GROUP, P.A.,         §
CARAGH FAY and,                  §
THOMAS FORTUNE FAY,              §
                                 §
        Defendants.              §

MEMORANDUM AND ORDER

Pending is Defendants' Omnibus Motion to Dismiss or In the Alternative to Transfer Venue (Document No. 12) ("Motion"), to which Plaintiffs responded in opposition (Document No. 15) and Defendants replied in support of their Motion (Document No. 18). After considering their submissions, the oral arguments of counsel, and applicable law, the Court concludes as follows.

I.   Background

This dispute arises out of a joint venture and written fee sharing agreement between Texas residents (Plaintiffs Roy & Gabel PLLC, Brandon Roy, and Christopher Gabel) and Maryland residents (Defendants The Fay Law Group, P.A., Caragh Fay, and Thomas Fortune Fay). Defendants contend, among other things in their Omnibus

Motion, that the Court does not have personal jurisdiction over them and move for dismissal.

As alleged, Plaintiffs searched for victims of the 1983 Beirut Bombing to determine their eligibility to recover damages from the Islamic Republic of Iran.[1]  Working from Texas, Plaintiffs spent thousands of hours meeting and communicating with potential clients, vetting their claims, and gathering evidence.[2] Eventually, more than 200 clients from around the nation signed representation agreements with Plaintiffs.[3]  Plaintiffs' initial representation and contingent fee agreements with their clients included a Texas choice of law provision, required that disputes to be resolved in Texas, and recognized that the agreements were performable in Texas.[4]  Eleven of Plaintiffs' clients reside in Texas.[5]

Plaintiffs learned that Defendant Thomas Fay years before had developed a niche practice litigating claims arising from the Beirut Bombing and that his daughter, Defendant Caragh Fay, had

---

[1] Document No. 8, First Amended Complaint at ¶¶ 2-4, 12, 14-15.

[2] Id. at ¶ 16.

[3] Id.

[4] Id. at ¶ 17.

[5] Id.

taken over his practice in Maryland.[6]   Plaintiffs contacted Ms.
Fay to inquire if she would share information about Plaintiffs'
prior representation of Beirut Bombing victims that might help
Plaintiffs in the prosecution of their clients' claims.[7]   Ms. Fay,
upon learning of Plaintiffs' success in recruiting clients,
invited Plaintiffs to Maryland to meet at Defendants' offices in
July 2017.[8]   Plaintiffs accepted the invitation.   During this
meeting in Maryland Ms. Fay proposed that Plaintiffs enter a joint
venture with the Fay Law Group jointly to represent Plaintiffs'
clients and a small number of the Fay Law Group's clients in a new
lawsuit against Iran, and to agree to share attorneys' fees
equally.[9]   Plaintiffs accepted Defendants' proposed joint venture,
and Ms. Fay prepared a Joint Counsel Agreement that the parties
signed at the meeting.[10]   The Joint Counsel Agreement stated: "The
Fay Law Group and Brandon Roy and Christopher Gabel agree to share
(50-50) the Hudson v. Iran case, which will be filed before the US
[sic] District Court for the District of Columbia in 2017."[11]   The

---

[6] Id. at ¶¶ 18-19.

[7] Id. at ¶ 21.

[8] Id.

[9] Id.

[10] Id.

[11] Document No. 15-1, Joint Counsel Agreement.

agreement specified that Roy and Gabel would receive 50% of the net attorneys' fees and the Fay Law Group would receive the other 50%.[12]

The parties agreed that the Texas-based Plaintiffs would have primary responsibility for recruiting additional clients and taking client damage depositions for use in trial.[13]   This, according to the Amended Complaint, was the most time-consuming work in performance of the joint venture.[14]   Defendants were responsible for preparing and filing a Complaint in Washington, D.C., serving Iran, applying for default judgment, submitting claims and evidence to a special master to determine the amounts of damages, and collecting and enforcing judgments.[15]   Defendants were expected to perform their work primarily in Maryland and Washington, D.C.

Plaintiffs fully performed under the joint venture by finding, recruiting, and vetting new clients from numerous states, obtaining representation agreements from the new clients, and taking client damage depositions.[16]   Plaintiffs performed their

---

[12] Id.

[13] Document No. 8, First Amended Complaint at ¶ 26.

[14] Id.

[15] Id. at ¶¶ 25-26.

[16] Id. at ¶¶ 28, 32.

work in Texas.[17]  On one occasion the Fay Law Group sent an attorney to Texas for a couple of days to train Plaintiffs in how to take a deposition for this kind of case and on how to organize the files in accordance with the Fay Law Group's preferences.[18]

Altogether, Plaintiffs successfully recruited more than 200 clients for the joint venture.  Then, in 2019, Defendants filed the suit captioned <u>Estate of Terry Hudson, et al. v. Islamic Republic of Iran</u>, No. 1:19-cv-377, in the United States District Court for the District of Columbia.[19]  Defendants insisted that they alone, and not Plaintiffs, be listed as counsel of record.[20]

After Plaintiffs had fully performed under the joint venture, Defendants sent to Plaintiffs in Texas a letter purporting to terminate the joint venture and the Joint Counsel Agreement and repudiating the Fay Law Group's obligation to pay Plaintiffs 50% of the attorneys' fees recovered in the <u>Hudson</u> suit.[21] Defendants' termination letter further included a copy of a letter that Defendants, according to the dates on the letters, had previously

---

[17] <u>Id.</u> at ¶¶ 28-29, 32.

[18] <u>Id.</u> at ¶¶ 30-31.

[19] <u>Id.</u> at ¶¶ 29, 33.

[20] <u>Id.</u> at ¶ 33.

[21] <u>Id.</u> at ¶¶ 34, 45.

sent to Plaintiffs' <u>Hudson</u> clients.[22] Defendants' letter to Plaintiffs' clients stated that Roy and Gabel had not participated in the suit, had failed to prosecute and represent the clients' claims, and that Defendants were cancelling their joint agreement with Roy and Gabel and were sending the clients a new agreement to retain "the Fay Group alone."[23] Defendants added that while the clients did not have to sign the new retainer agreement with the Fay Law Group alone, if they chose not to do so, they would need new representation.[24] Defendants sent this interference letter to all of Plaintiffs' clients, including Plaintiffs' eleven clients who are residents of Texas.[25]

Plaintiffs Roy and Gabel filed this suit in state court in Harris County, Texas,[26] and Defendants removed it based on diversity jurisdiction.[27] Defendants move to dismiss Plaintiffs' First Amended Complaint under Rule 12(b)(2), (b)(3), and (b)(6).[28]

---

[22] <u>Id.</u> at ¶ 47.

[23] <u>Id.</u> at ¶ 49.

[24] <u>Id.</u>

[25] <u>Id.</u> at ¶ 53.

[26] Document No. 1-2, Original Petition for Breach of Contract, Tortious Interference with Existing Contracts.

[27] Document No. 1, Notice of Removal.

[28] Plaintiffs' First Amended Complaint is the live pleading. Accordingly, Defendants' original omnibus motion to dismiss the original pleading (Document No. 7) is DENIED as MOOT.

Alternatively, Defendants request that the Court transfer the suit to Maryland.

## II.  Personal Jurisdiction

A federal court may exercise personal jurisdiction over a nonresident defendant if:  (1) the nonresident defendant is amenable to service of process under the state's long-arm statute; and (2) the exercise of jurisdiction comports with the Fourteenth Amendment's due process cause.  *See* Electrosource, Inc. v. Horizon Battery Techs., Ltd., 176 F.3d 867, 871 (5th Cir. 1999) (citation omitted).  Because the Texas long-arm statute extends as far as due process permits, the sole inquiry is whether subjecting Defendants to suit in Texas would offend due process.  Id.

The due process inquiry focuses upon whether the nonresident defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  Int'l Shoe Co. v. Washington, 66 S. Ct. 154, 158 (1945) (citation omitted).  "There are two types of 'minimum contacts': those that give rise to specific personal jurisdiction and those that give rise to general personal jurisdiction."  Lewis v. Fresne, 252 F.3d 352, 358 (5th Cir. 2001).  Specific jurisdiction exists when the cause of action relates to or arises out of the defendant's contacts with the forum.  *See* Helicopteros Nacionales de Colombia, S.A. v. Hall, 104

S. Ct. 1868, 1872 n.8 (1984) (citation omitted). General jurisdiction may be exercised over a defendant whose contacts with the forum are so substantial, systematic, and continuous that the defendant is essentially at home in the state. *See* Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S. Ct. 2846, 2853–54 (2011).

When the court does not conduct an evidentiary hearing on the question of personal jurisdiction, the party seeking to establish jurisdiction bears the burden of presenting a prima facie case of jurisdiction. *See* Alpine View Co. v. Atlas Copco AB, 205 F.3d 208, 215 (5th Cir. 2000) (citation omitted). "Proof by a preponderance of the evidence is not required." Johnston v. Multidata Sys. Int'l Corp., 523 F.3d 602, 609 (5th Cir. 2008) (citation omitted). Uncontroverted allegations in the plaintiff's complaint must be taken as true. *See* Alpine View, 205 F.3d at 215 (citation omitted).

Only specific jurisdiction is at issue in this suit. The Fifth Circuit applies a three-step analysis in determining the constitutionality of specific jurisdiction for a nonresident defendant: "(1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise

of personal jurisdiction is fair and reasonable." <u>McFadin v. Gerber</u>, 587 F.3d 753, 759 (5th Cir. 2009) (citation omitted). "Once a plaintiff has established minimum contacts, the burden shifts to the defendant to show the assertion of jurisdiction would be unfair." <u>Wien Air Alaska, Inc. v. Brandt</u>, 195 F.3d 208, 215 (5th Cir. 1999) (citation omitted).

Whether "contacts are sufficient to justify subjection of the non-resident to suit in the forum is determined not on a mechanical and quantitative test, but rather under the particular facts [and] the quality and nature of the activity with relation to the forum state." <u>Miss. Interstate Express, Inc. v. Transpo, Inc.</u>, 681 F.2d 1003, 1006 (5th Cir. 1982). "A single act by a defendant can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted." <u>Lewis</u>, 252 F.3d at 358–59 (citation omitted).

Because Plaintiffs brings two "claims that arise out of different forum contacts[,]" Plaintiffs "must establish specific jurisdiction for each claim." <u>Danziger & De Llano, L.L.P. v. Morgan Verkamp, L.L.C.</u>, 24 F.4th 491, 495 (5th Cir. 2022) (citation omitted). Plaintiffs' claims for tortious interference and breach of contract will therefore be separately considered.

A.   Tortious Interference

In an intentional tort case, personal jurisdiction cannot be predicated on a defendant's random, fortuitous, or attenuated contacts with the forum or on the unilateral activity of the plaintiff.  Id. (quoting Walden v. Fiore, 134 S. Ct. 1115, 1123 (2014)).  "A forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum."  Id.  The "mere injury to a forum resident is not sufficient connection to the forum."  Id. at 496-97 (quoting Walden, 134 S. Ct. at 1125).  "The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way."  Id. at 497.  Importantly, "[w]hen a nonresident defendant commits a tort within the state, or an act outside the state that causes tortious injury within the state, that tortious conduct amounts to sufficient minimum contacts with the state by the defendant to constitutionally permit courts within that state, including federal courts, to exercise personal adjudicative jurisdiction over the tortfeasor and the causes of actions arising from its offenses or quasi-offenses."  Guidry v. U.S. Tobacco Co., 188 F.3d 619, 628 (5th Cir. 1999) (citing cases).

Here, accepting Plaintiffs' uncontroverted allegations as true, when Defendant mailed letters to Plaintiffs' Texas clients in Texas to persuade Plaintiffs' clients to enter into new retainer agreements with Defendants alone, Defendants intentionally interfered with Plaintiffs' attorney/client contractual relationships with its Texas clients by making Plaintiffs' performance in Texas either impossible or more burdensome, difficult, and expensive. To convince Plaintiffs' clients to renounce their existing contracts with their Texas attorneys and to enter new agreements with Defendants, Defendants also defamed the Texas Plaintiffs by falsely stating that Plaintiffs had failed to participate and prosecute the clients' cases against Iran. When Defendants entered Texas through their use of the mails to defame Plaintiffs and intentionally to interfere with Plaintiffs' representation agreements with Texas clients, Defendants purposely reached out beyond their own state and into Texas to engage in tortious conduct. The damage resulting from Defendants' interference was also suffered in Texas where Plaintiffs reside and practice law.

Because Defendants purposefully availed themselves of the privileges of conducting activities in Texas, the due process clause is not offended by requiring Defendants to defend Plaintiffs' tortious interference claim in Texas. *See* <u>Trois v. Apple Tree Auction Ctr., Inc.</u>, 882 F.3d 485, 491-92 (5th Cir.

2018); *see also* <u>Wien Air</u>, 195 F.3d at 213 ("When the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment.").

Defendants rely on the Fifth Circuit's <u>Danziger</u> decision to argue they are not subject to specific jurisdiction. <u>Danziger</u> involved a Texas law firm that sued a nonresident law firm for, among other things, tortious interference with prospective relations. 24 F.4th at 494. Danziger alleged that the nonresident firm sent an email to the potential client--who was not alleged to be a resident of or have any connection to Texas--to convince him not to formalize his relationship with Danziger. <u>Id.</u> at 497. In finding no jurisdiction, the Fifth Circuit reasoned that "although [the nonresident's] allegedly tortious conduct may have *affected* [the forum plaintiff] in Texas, none of this conduct *occurred* in Texas." <u>Id.</u> (emphasis in orig.). "The only act or omission of [the nonresident] that is even plausibly *connected* to Texas is [the nonresident's] allegedly fraudulent reply to [the forum plaintiff's] unsolicited email about [the client.]" <u>Id.</u> (emphasis in orig.). The Fifth Circuit recognized that the state does not have personal jurisdiction over a nonresident who merely answers an uninitiated, unsolicited phone call, and thus, the single reply email did not meaningfully connect the nonresident to Texas. <u>Id.</u> at 497-98.

In stark contrast to *Danziger*, Defendants here purposely reached out to Texas by sending multiple letters directly to Plaintiffs' Texas clients to solicit their business to the exclusion of Plaintiffs with whom the clients had existing client representation agreements. *See* Cent. Freight Lines Inc. v. APA Transp. Corp., 322 F.3d 376, 383 (5th Cir. 2003) ("specific personal jurisdiction may be based on intentionally tortious conduct that is purposefully directed toward the forum state").

Because Defendants purposefully availed themselves to the "privilege of causing a consequence" in Texas, and because Defendants make no showing that the exercise of jurisdiction would not be fair and reasonable, Defendants' motion to dismiss Plaintiffs' tortious interference claim for lack of specific jurisdiction is DENIED. *See* Defense Distributed v. Grewal, 971 F.3d 485, 494-96 (5th Cir. 2020) (holding that a letter delivered into Texas, which itself gave rise to the tort, constituted purposeful availment); Trois, 882 F.3d at 491 (recognizing that specific personal jurisdiction is present "over an intentional-tort claim where a nonresident defendant places a call to a forum and makes false statements over the phone to a forum resident" (citing cases.)); *see also* Cent. Freight, 322 F.3d at 383-84 (exercising jurisdiction where the plaintiff pled that defendant committed intentional torts that were purposefully directed at the

plaintiff's contractual business relationship with another Texas entity).

B.   Breach of Contract

"When determining whether a court has personal jurisdiction over a breach of contract claim, 'only those acts which relate to the formation of the contract and the subsequent breach are relevant,' including 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing.'"   Danziger, 24 F.4th at 500 (quoting Trois, 882 F.3d at 489).   Contracting with a resident of the forum state is not enough to establish minimum contacts.   Id. (quoting Moncrief Oil Int'l Inc. v. OAO Gazprom, 481 F.3d 309, 311 (5th Cir. 2007)).   Moreover, "a plaintiff's unilateral activities in Texas do not constitute minimum contacts where the defendant did not perform any of its obligations in Texas, the contract did not require performance in Texas, and the contract is centered outside of Texas."   Id. (quoting Moncrief Oil, 481 F.3d at 312)).   "An exchange of communications in the course of developing and carrying out a contract also does not, by itself, constitute the required purposeful availment of the benefits and protections of Texas law."   Id.   "Random, fortuitous, or attenuated contacts are not sufficient to establish jurisdiction."   Moncrief Oil, 481 F.3d at 312 (citing Burger King Corp. v. Rudzewicz, 105 S. Ct. 2174, 2183 (1985)).

Here, Plaintiffs initiated the contact with Defendants in Maryland to seek advice on how to prosecute their Beirut Bombing cases. When Defendants learned of the great number of claimants who had retained Plaintiffs, they invited Plaintiffs to Maryland to meet. At the meeting it was Defendants who conceived and proposed to Plaintiffs a joint venture and fee-splitting arrangement. Plaintiffs agreed, and Defendants prepared and the parties executed a Joint Counsel Agreement, agreeing "to share (50-50)" and providing that they would file the case alleging the clients' claims against Iran in the District of Columbia ("D.C."). Thus, Plaintiffs and Defendants during their initial meeting in Maryland completed negotiations and agreed to a joint venture for handling their Beirut Bombing cases, and finalized and signed their Joint Counsel Agreement in Maryland. In short, all "acts which relate to the formation of the contract," Danziger, 24 F.4th at 500, took place in Maryland. None is alleged to have occurred in Texas.

Plaintiffs argue, however, that Defendants established minimum contacts by (1) soliciting a long-term joint venture with a Texas resident in which Plaintiffs fully performed their obligations in Texas; (2) sending a representative to Texas to train Plaintiffs on taking depositions and preparing the files for the D.C. litigation; (3) agreeing that Defendants would deliver and pay Plaintiffs their 50% share of attorneys' fees in Texas;

and (4) sending the repudiation letter to Texas and thereby breaching their agreement in Texas.

First, as seen above, it was not Defendants but Plaintiffs who solicited help from Defendants in Maryland, traveled to Maryland to meet with Defendants, and while in Maryland agreed to a joint venture proposed by Defendants. "[M]erely contracting with a resident of Texas is not enough to establish minimum contacts." Moncrief Oil, 481 F.3d at 312 (citing Latshaw v. Johnston, 167 F.3d 208, 211 (5th Cir. 1999)).

Plaintiffs rely on Central Freight Lines Inc. v. APA Transp. Corp., 322 F.3d 376 (5th Cir. 2003), to argue that soliciting a forum resident to enter a long-standing contractual relationship with the foreseeable result of causing economic activity in the forum is sufficient to establish minimum contacts. The facts in Central Freight, in which the Fifth Circuit held that the defendant "should have reasonably anticipated being haled into court in Texas on breach of contract claims[,]" were quite different. Id. at 383. In Central Freight the defendant had specifically and deliberately reached out to a Texas corporation by telephone and mail with the deliberate aim of entering into a long-standing contractual relationship with a Texas corporation. Id. at 382. The defendant had traveled to Texas to meet at the plaintiff's headquarters in Texas to obtain information about the plaintiff in search of a partner in Texas. Id. The Central Freight contract,

16

as the Fifth Circuit has observed, "contemplated that the plaintiff would make shipments from Texas on behalf of third-party Texas customers[, and that the] plaintiff's Texas location was strategically advantageous to the defendant and was the basis for the agreement[.]" Moncrief Oil, 481 F.3d at 313 (citing Cent. Freight, 322 F.3d at 382). These facts "suggest[ed] that the defendant had purposefully availed itself of doing business in Texas." Id.

Here, much to the contrary, there are no allegations that Plaintiffs' law office in Texas had any strategic advantage to Defendants or that Plaintiffs' Texas location played any role whatever in Defendants' decision to propose and to agree to a venture with Plaintiffs. Defendants were attracted not to Texas but to Plaintiffs' portfolio of 200-plus clients that Plaintiffs had recruited from around the nation, only 11 of whom were Texas residents. The state in which these case-recruiters maintained their office is not alleged to have had any strategic advantage to Defendants nor to the performance of the joint venture such as to warrant a finding that Defendants had purposefully availed themselves of doing business in Texas. See, e.g., Danziger, 24 F.4th at 501-02; Moncrief Oil, 481 F.3d at 313. Merely foreseeing that the plaintiffs would perform their contractual obligations in

the forum is insufficient to establish minimum contacts.  Moncrief
Oil, 481 F.3d at 313.

The fact that Plaintiffs chose to perform their obligations
in Texas fails to show that Defendants purposefully availed
themselves of the benefits of doing business in Texas.  *See, e.g.*,
Trois, 882 F.3d at 489 n.2 (citation omitted); Moncrief Oil, 481
F.3d at 311-13.  Nothing in the parties' agreement as alleged
required Plaintiffs to perform in Texas.  Given the central purpose
of the joint venture--jointly to represent clients in a suit to be
filed against Iran in the District of Columbia, Plaintiffs'
decision to perform its work in recruiting clients and taking
damage depositions in Texas does not meaningfully connect
Defendants to Texas.  *See, e.g.*, Moncrief Oil, 481 F.3d at 311 ("A
plaintiff's or third party's unilateral activities cannot
establish minimum contacts between the defendant and forum state."
(citation omitted)).

Plaintiffs further argue that sending a representative to
Texas in November 2019 for a couple of days to train Plaintiffs on
how to take a deposition for a Beirut Bombing damage case and on
how Defendants preferred to have the files prepared establishes
the requisite purposeful availment.  This representative's single
trip to Texas to take a virtual deposition as an example and to
explain Defendants' clerical preferences for assembling files is
*de minimis* in the context of this 2017 joint venture agreement to

18

file a massive federal lawsuit in Washington, D.C. for hundreds of clients, which suit is still pending nearly seven years later. Plaintiffs do not allege that their cause of action "arises out of or results from the defendant's forum-related contacts" on that two-day trip. McFadin, 587 F.3d at 759. Fifth Circuit jurisprudence, as seen above at pages 7-9, requires analysis of "the particular facts [and] the quality and nature of the activity with relation to the forum state" in determining if a non-resident is subject to personal jurisdiction in the forum state. *See* Danziger, 24 F.4th at 498 (quoting Miss. Interstate, 681 F.3d at 1006). Applying that standard, it would offend traditional notions of fair play and substantial justice to exercise jurisdiction over Defendants based only on their having sent a representative to Texas on a two-day down-and-back trip to give a deposition tutorial and some clerical training. Moreover, the virtual deposition training could have been done anywhere. This contact with Texas was predicated "on nothing but 'the mere fortuity that [Plaintiffs] happen[] to be [] resident[s] of the forum.'" Holt Oil & Gas Corp. v. Harvey, 801 F.2d 773, 778 (5th Cir. 1986) (citing cases). "Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." Walden, 134 S. Ct. at 1123 (citation omitted).

19

Plaintiffs also allege that the parties agreed (although not in writing) that Defendants would pay Plaintiffs their portion of the attorneys' fees in Texas. The Fifth Circuit, however, has recognized that mailing payments to Texas does not weigh heavily in the minimum contacts analysis where performance of the contract was centered elsewhere. *See, e.g.*, Holt Oil, 801 F.2d at 778 (citing cases). Here, the critical performance of the joint venture was centered in D.C. where the lawsuit on behalf of 200-plus clients was to be prosecuted. The splitting of fees was to happen after all the other objectives of the venture had been successfully performed--the lawsuit had been filed, the claims had been adjudicated, monetary judgments had been won, the judgments had withstood any post-trial appeals or challenges, the judgments had become final and successfully collected, the "Lobbyist Fees and Investigator Fees" had been paid, and the clients had received their agreed shares of the proceeds. Only then were the attorneys to split their fees 50-50. If, as pled, "Defendants were obligated to pay Plaintiffs their 50% share of the attorneys' fees" in Texas, that "contact"--not coming until the very end of the joint venture--is based on the mere fortuity that Plaintiffs reside in Texas. This is a wholly insufficient basis upon which to find that Defendants "purposely directed [their] activities toward [Texas] or purposely availed [themselves] of the privileges of conducting activities there." McFadin, 587 F.3d at 759.

20

Finally, as alleged, Defendants breached their agreement by repudiating the agreement to pay Plaintiffs when Defendants sent their repudiation letter to Plaintiffs in Texas.  This Texas contact is also predicated on the mere fortuity that Plaintiffs resided in Texas.  Had Plaintiffs resided elsewhere Defendants would have sent the letter there.  "Random, fortuitous, or attenuated contacts are not sufficient to establish jurisdiction." Moncrief Oil, 481 F.3d at 312 (citing Burger King Corp., 105 S. Ct. at 2183); see also Pioneer Exploration Ltd. v. Savoie, No. H-07-798, 2007 WL 4298715, at *3 (S.D. Tex. Dec. 3, 2007) (holding defendant's oil and gas lease repudiation letter sent to plaintiff oil company located in Houston "is a random, fortuitous contact because [the defendant] would have sent the letter to whatever state in which [plaintiff oil company] was located," and does not subject defendant to jurisdiction in Texas); Qassas v. Daylight Donut Flour Co., No. 4:09-cv-0208, 2009 WL 1795004, at *1, 6, (S.D. Tex. Jun. 24, 2009) (holding that defendant Oklahoma corporation's sending termination letter to plaintiff at his Texas home, did not establish minimum contacts to establish specific personal jurisdiction over the Oklahoma defendant).  So it is here.

Because Defendant's contacts with Texas related to the contract are too attenuated and fortuitous to find that Defendants purposefully availed themselves of the benefits and protections of the forum, Plaintiffs have failed to make a prima facie case that

this Court has specific personal jurisdiction over Plaintiffs'
contract claims.   Plaintiffs' contract claims must therefore be
dismissed for lack of personal jurisdiction.

## III. Improper Venue

Defendants move to dismiss under Rule 12(b)(3), contending
that venue is improper under 28 U.S.C. § 1391(b).   However,
Defendants removed this case from state court.   Accordingly,
§ 1391(b) "has no application to this case because this is a
removed action."   Polizzi v. Cowles Magazines, Inc., 73 S. Ct.
900, 902-03 (1953); see also Republic Capital Dev. Group, L.L.C.
v. A.G. Dev. Grp., Inc., No. CIV.A. H-05-1714, 2005 WL 3465728, at
*8 & n.46 (S.D. Tex. Dec. 19, 2005) ("Venue in removed cases is
governed solely by the removal statute, 28 U.S.C. § 1441, not
§ 1391, the general venue statute. . . . Defendants' voluntary
application for removal confers venue over them in this court.")
(Lake, J.).

Defendants' motion to dismiss for improper venue is DENIED.

## IV.   Convenience Transfer

Defendants further argue that this case should be transferred
to the District of Maryland for the convenience of the parties and
witnesses.   See 28 U.S.C. § 1404(a).   The purpose of § 1404(a) is
to protect litigants, witnesses, and the public against

22

unnecessary inconvenience and expense, and to avoid the waste of time, energy, and money. <u>Van Dusen v. Barrack</u>, 84 S. Ct. 805, 809 (1964). The transfer of an action under § 1404 is committed to the sound discretion of the district court. <u>Jarvis Christian Coll. v. Exxon Corp.</u>, 845 F.2d 523, 528 (5th Cir. 1988).

Under § 1404(a), the movant bears the burden of showing "good cause" to transfer venue. <u>In re Volkswagen of Am., Inc.</u> ("<u>Volkswagen II</u>"), 545 F.3d 304, 315 (5th Cir. 2008) (en banc). "This 'good cause' burden reflects the appropriate deference to which the plaintiff's choice of venue is entitled." <u>Id.</u> "When the movant demonstrates that the transferee venue is clearly more convenient, . . . it has shown good cause and the district court should therefore grant the transfer." <u>Id.</u> However, "when the transferee venue is not clearly more convenient than the venue chosen by the plaintiff, the plaintiff's choice should be respected." <u>Id.</u> A court should not transfer a case "if the only practical effect is to shift inconvenience from the moving party to the nonmoving party." <u>Goodman Co. v. A & H Supply, Inc.</u>, 396 F. Supp. 2d 766, 776 (S.D. Tex. 2005) (internal quotation marks and citation omitted).

The threshold question under § 1404(a) is whether the plaintiff's claim could have been filed in the judicial district to which transfer is sought. <u>In re Volkswagen AG</u> ("<u>Volkswagen I</u>"), 371 F.3d 201, 203 (5th Cir. 2004). If so, the court then

considers a number of private interest and public interest factors
to determine whether transfer is for the convenience of the parties
and in the interest of justice.  Volkswagen II, 545 F.3d at 315.
"The private interest factors are: (1) the relative ease of access
to sources of proof; (2) the availability of compulsory process to
secure the attendance of witnesses; (3) the cost of attendance for
willing witnesses; and (4) all other practical problems that make
trial of a case easy, expeditious and inexpensive."  Id. (internal
quotation marks and citation omitted).   "The public interest
factors are:  (1) the administrative difficulties flowing from
court congestion; (2) the local interest in having localized
interests decided at home; (3) the familiarity of the forum with
the law that will govern the case; and (4) the avoidance of
unnecessary problems of conflict of laws or in the application of
foreign law."  Id.  Although these factors "are appropriate for
most transfer cases, they are not necessarily exhaustive or
exclusive," and no single factor is dispositive.  Id.

It is undisputed that Plaintiffs could have filed suit in the
District of Maryland, where Defendants reside.  Thus, the private
and public interest factors will be considered to determine whether
a venue change to Maryland would be more convenient for the parties
and witnesses and in the interest of justice.

As to the first private interest factor, the relative ease of
access to sources of proof is neutral.  Plaintiffs and Defendants

24

will each have relevant documents in their possession; Plaintiffs documents will be in Texas and Defendants will be in Maryland. Defendants fail to identify any third-party sources of proof specifically pertinent to the tortious interference claim, but Defendants acknowledge that "Plaintiffs have alleged that eleven [witnesses] are in Texas and nine are in Maryland."[29] Defendants admit that the second and third private interest factors are neutral.[30] As to final private interest factor, all other practical problems that make trial of a case easy, expeditious, and inexpensive, does not weigh in favor of transfer. Defendants allege that it will be difficult for Defendants to litigate and attend trial in Texas, but they identify no facts suggesting that their difficulty in litigating and attending trial in Texas would be greater than the burden on Plaintiffs to litigate and attend trial in Maryland. The only practical effect of transferring the case would be to shift the inconvenience from Defendants to Plaintiffs. Defendants fail to demonstrate that any of the private interest factors weigh in favor of transfer.

The public interest factors likewise do not weigh in favor of transfer. Defendants concede the administrative difficulties factor weighs against transfer inasmuch as cases in the Southern

---

[29] *See* Document No. 12 at 16.

[30] Id.

District of Texas are resolved on average faster than in Maryland.[31]
The undersigned judge to whom this case was randomly assigned
presently has no backlog of cases to be tried.  The same has not
been shown for the Maryland courts.  Further, a Docket Control
Order with a Docket Call date will soon be issued in this matter.
The same has not been shown to be imminent if the case were
transferred to Maryland.  This first public interest factor weighs
against transfer.

The second public interest factor, namely the local interest
in having localized interests decided at home, weighs heavily
against transfer.  Texas Plaintiffs allege that Defendants
interfered with their attorney/client contracts, making the
performance of their client representation agreements more
burdensome, difficult, and expensive, and that a significant part
of Defendants' tortious interference occurred when Defendants
delivered their interference letters to Plaintiffs' Texas clients.
Defendants in the interference letters falsely stated that
Plaintiffs had not participated in the prosecution of their
clients' cases.  Texas has a high interest in providing just
remedies for its residents who are the victims of actors who make
and transmit into Texas false and libelous accusations regarding

---

[31] <u>Id.</u> at 18.

the victims' professional or business conduct, and concomitantly, Texas has a high interest in the outcome of this dispute.

The third public interest factor, namely the familiarity of the forum with the law that will govern the case, does not weigh in favor of transfer.  Although Defendants argue that Maryland law governs the tortious interference claim, Defendants have not so proven.  Moreover, Defendants argue that Roy & Gabel PLLC's claims were extinguished under Texas law, not Maryland law, and thus Texas law at least will control in part.  Finally, Defendants admit that the fourth public interest factor is neutral because this case does not involve foreign law.[32]

In sum, Defendants have not shown that the private and public interest factors weigh in favor of transfer and that it would be clearly more convenient and in the interest of justice to litigate this case in Maryland.  Defendants' § 1404(a) motion is DENIED.

## V.   Failure to State a Claim

Lastly, Defendants move to dismiss Plaintiffs' claims for tortious interference with existing contract under Rule 12(b)(6), which provides for dismissal of an action for "failure to state a claim upon which relief can be granted[.]"  FED. R. CIV. P. 12(b)(6).  To avoid dismissal, a complaint must plead "enough facts to state

---

[32] Id.

a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). While a complaint "does not need detailed factual allegations," the "[f]actual allegations must be enough to raise a right to relief above the speculative level," assuming "that all the allegations in the complaint are true (even if doubtful in fact)[.]" Twombly, 127 S. Ct. at 1964-65 (internal citations omitted).

When a district court reviews the sufficiency of a complaint before it receives any evidence either by affidavit or admission, its task is inevitably a limited one. See Scheuer v. Rhodes, 94 S. Ct. 1683, 1686 (1974), abrogated on other grounds by Harlow v. Fitzgerald, 102 S. Ct. 2727 (1982). The issue is not whether the plaintiff ultimately will prevail, but whether the plaintiff is entitled to offer evidence to support the claims. Id. The "Court construes the complaint liberally in favor of the plaintiff, and takes all facts pleaded in the complaint as true." Harrington v. State Farm Fire & Cas. Co., 563 F.3d 141, 147 (5th Cir. 2009) (quoting Gregson v. Zurich Am. Ins. Co., 322 F.3d 883, 885 (5th Cir. 2003)). The question for the court is whether, "in the light most favorable to the plaintiff and with every doubt resolved on

[its] behalf, the complaint states any valid claim for relief."
Id. (quoting Gregson, 322 F.3d at 885).

Defendants argue first that Plaintiffs have failed plausibly to plead that Defendants used "improper means" to achieve the interference, *i.e.*, "violence or intimidation, defamation, injurious falsehood or other fraud, violation of the criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith."[33] Plaintiffs allege facts, however, from which reasonable inferences may be drawn that Defendants interfered by defaming Plaintiffs and stating injurious falsehoods against Plaintiffs when they wrote to Plaintiffs' clients to induce those clients on false premises to terminate their attorney/client relationships with Plaintiffs and to sign new engagement letters with Defendants alone.

Defendants argue next that Plaintiffs failed to allege that they were damaged by Defendants' interference. Plaintiffs plausibly plead, however, that Defendants' interference has made representing Plaintiffs' clients either impossible or more burdensome, difficult, and expensive.

Finally, Defendants argue that Plaintiff Roy & Gabel PLLC's claims were extinguished when it failed to bring its claims within three years of forfeiting its business certificate. Public records

---

[33] Id. at 20.

reflect that on February 28, 2020 Roy & Gabel PLLC's registration was forfeited under § 171.309 of the Texas Tax Code.[34]   Texas Business Organizations Code § 11.359(a) states that "an existing claim by or against a terminated filing entity is extinguished unless an action or proceeding is brought on the claim not later than the third anniversary of the date of termination of the entity."   Relying on this statute, Defendants argue that Roy & Gabel PLLC had until February 28, 2023 to file suit otherwise their claims would be extinguished.

Plaintiffs in response point out an exception.   Subsection (c) states that "the extinguishment of an existing claim with respect to a terminated filing entity as provided by this section is nullified if: . . . (4) the terminated filing entity's certificate of formation is reinstated under the Tax Code with retroactive effect as provided by Section 11.254[.]"   On March 17, 2023, the Texas Comptroller of Public Accounts stated that the firm was "eligible for reinstatement[.]"[35] Roy filed an Application for Reinstatement signed May 14, 2023,[36] and the Texas Secretary of State's website reflects that Roy & Gabel, PLLC is "In existence" and the duration is "Perpetual."   *See* TEX. BUS. ORG. CODE

---

[34] *See, e.g.*, <u>id.</u> at Exhibit A.

[35] <u>Id.</u> at Exhibit B.

[36] <u>Id.</u>

ANN. § 11.254(a).   The pleadings supplemented by public records do not establish that Plaintiff Roy & Gabel, PLLC's claims are extinguished.[37]   Defendants' motion for dismissal under Rule 12(b)(6) is DENIED.

VI.  <u>Order</u>

For the foregoing reasons, it is

ORDERED that Defendants' Omnibus Motion to Dismiss or In the Alternative to Transfer Venue (Document No. 12) is GRANTED IN PART, and Plaintiffs' claims for breach of contract and declaratory judgment are DISMISSED WITHOUT PREJUDICE for lack of personal jurisdiction; and Defendants' motion otherwise is in all things DENIED.

The Clerk will enter this Order, providing a correct copy to all counsel of record.

SIGNED at Houston, Texas, on this 21ST day of February, 2024.

EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE

---

[37] Defendants rely on <u>Emmett Properties, Inc. v. Halliburton Energy Services, Inc.</u>, 167 S.W.3d 365, 370 (Tex. App.--Houston [14th Dist.] 2005, pet. denied) to argue that the extinguished claims cannot be revived.   But that case predated the 2021 amendment that added subsection (c) that nullifies the extinguishment.